IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DARR ANGELL, Individually,
and STATE OF NEW MEXICO,
ex rel DARR ANGELL,
    Plaintiffs,

vs.                                **No. CV 03-318 JH/RLP**

SHELL OIL COMPANY,
POLARIS PRODUCTION CORPORATION,
and UNITED OPERATING, LLC,
    Defendants.

### DEFENDANT POLARIS PRODUCTION CORPORATION'S
### REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**COMES NOW** Defendant Polaris Production Corporation, by and through their attorneys of record, Atwood, Malone, Turner & Sabin, and hereby submits the following Findings of Fact[1] and Conclusions of Law:

### FINDINGS OF FACT

1.    Absent a recent rain, there is no surface water in Lea County. *Tr. Volume 1, Page 40, Lines 12-14.*

2.    On the ranch which encompasses the properties at issue in this litigation, there are 25 windmills providing domestic water. *Tr. Volume 1, Page 40, Lines 18-20.*

3.    Plaintiff does not own any water rights underlying the ranch properties at issue in this litigation. *Tr. Volume 1, Pages 45, Line 24, through Page 46, Line 1.*

4.    Plaintiff did not acquire his interests in the subject property until 1992. *Tr. Volume 1, Page 47, Line 10.*

---

[1] In accordance with instructions given by the Court, the Requested Findings of Fact are supported by citations to the transcript of proceedings, hereinafter abbreviated "Tr.," with additional references to Volume, Page, and Line numbers.

5.      According to Plaintiff, the producing property known as the "Priest Lease" was "in really bad shape," at the time Plaintiff acquired his interests in the ranch. *Tr. Volume 1, Page 47, Lines 11-14.*

6.      In approximately 2001, Plaintiff caused to be drilled a test well, identified as Monitor Well No. 1, adjacent to and on the east side of the property occupied by the Priest Lease tank battery and/or pit. *Tr. Volume 1, Page 49, Lines 7 through Page 50, Line 6.*

7.      All groundwater testing the Plaintiff caused to be performed, was therefore conducted after Polaris ceased its operations. *Id.*

8.      The groundwater beneath this ranch generally travels along a natural gradient from northwest to southeast. *Tr. Volume 1, Page 50, Lines 22-25.*

9.      The fastest rate at which underground water can migrate beneath the subject property is 75 feet annually. *Tr. Volume 1, Page 51, Lines 8-13.*

10.     In causing the drilling of Monitor Well No. 1, Plaintiff observed that the "only first 5 to 7 feet" of soil were stained. *Tr. Volume 1, Page 56, Lines 22-24.*

11.     Plaintiff claims as of June 8, 2006, almost 6 years after Polaris ceased its operations, that above the water table at the site of Monitor Well No. 1, there is a layer of oil measuring 8 feet in thickness. *Tr. Volume 1, Page 63, Line 25, through Page 64, Line 2.*

12.     There are multiple other operations for the exploration and production of oil and gas in the area around the property known as the Priest Lease. *Tr. Volume 1, Page 64, Lines 14-21.*

13.     Shell operated the Priest Lease from 1947 to 1973. *See Pretrial Order Stipulated Factual Contention No. 2.*

14.     Plaintiff cannot be sure that the oil alleged to be located on top of the water table did not come from Shell's oil and gas operations on the Priest Property. *Tr. Volume 1, Page 74, Line 24 through Page 75, Line 9.*

15.     There is a pipeline previously operated by Amoco immediately east of the Priest Lease tank battery. *Tr. Volume 1, Page 67, Lines 17-23.*

16.     A company known as EOTT experienced 3 separate spills near the location of the Priest Lease. *Tr. Volume 1, Page 72, Lines 6-7.*

17.     In attempting to remediate the aforesaid spills, EOTT or its agents have recovered 1,200 barrels of oil. *Tr. Volume 1, Page 72, Lines 9-10.*

18.     A minimum of 1,200 barrels from EOTT's spills caused only 6 inches of oil to be on top of the water table. *Tr. Volume 1, Page 83, Lines 8-12.*

19.     Plaintiff presented no evidence or testimony as to the requisite volume of oil it would take to cause 8 feet of oil on top of the water table.

20.     Of the 25 windmill wells identified by Plaintiff, none reflects any impact by the oil and gas operations conducted on the Priest Lease. *Tr. Volume 1, Page 79, Lines 13-16.*

21.     The only well which reflects any ground water impact allegedly caused by oil and gas operations is Monitor Well No. 1 drilled at the insistence of Plaintiff. *Tr. Volume 1, Page 79, Lines 17-19.*

22.     Plaintiff does not use nor has he ever used Monitor Well No. 1 for his cattle. *Tr. Volume 1, Page 79, Lines 20-22.*

23.     The oil and gas producing field known as the Denton Field lies approximately 9 miles east of Lovington, New Mexico. *Tr. Volume 1, Page 90, Lines 6-11.*

24.     The Priest Lease is located within the Denton Field. *Tr. Volume 1, Page 90, Lines 12-15.*

25.     The New Mexico Oil Conversation Division ("OCD") publishes a document entitled "Guidelines for Remediation of Leaks, Spills, and Releases for the State of New Mexico," ("the OCD Guidelines") the publication of which began in 1993. *Tr. Volume 1, Page 90, Lines 22-24, and Page 92, Lines 16-19.*

26.     The policy of the OCD regarding oilfield contamination is that the best approach to the correction of environmental problems is to look only to the current operator of the subject property. *Tr. Volume 1, Page 163, Lines 15-21.*

27.     OCD field representatives occasionally complete documents entitled "Field Reports," and it is the purpose of those field reports to note problem areas. *Tr. Volume 1, Page 165, Lines 3-10.*

28.     If an OCD field representative visits a location, and does not complete a field report, the lack of such a report is a clear indication that the field representative did not detect any problem areas. *Tr. Volume 1, Page 165, Lines 20-23.*

29.     Leaks and spills of oil, gas, produced water, and other substances are common in the oil and gas production industry. *Tr. Volume 1, Page 165, Line 24 through Page 166, Line 15.*

30.     OCD field representatives completed no field reports on the Priest Lease subsequent to July, 1996. *Tr. Volume 1, Page 168, Line 21 through Page 169, Line 10.*

31.     On or about August 21, 1997, an OCD field representative (Gary Wink) testified under oath during an OCD hearing that with specific reference to the Priest Lease, there was no evidence of groundwater pollution. *Tr. Volume 1, Page 170, Line 7 through*

Page 171, Line 12.

32.     The OCD never imposed a fine against Defendant Polaris Production related
to the Priest Lease. Tr. Volume 1, Page 172, Lines 19-21.

33.     In 1973, Shell sold all of its interests in Section 1 to Centaur Petroleum Corp.
and Polaris Production Corp. ("Polaris").     See Pretrial Order, Stipulated Factual
Contentions No. 3, Trial Transcript, Page 28, Lines 8-11.

34.     Dynasty Oil and Gas, LLC acquired its interests in the north half of Section
1 ("the Priest Lease") from Polaris on September 25, 2000. See Pretrial Order, Stipulated
Factual Contentions No. 3, Trial Transcript, Page 192, Lines 14-17.

35.     United Operating, LLC ("United") became the operator of the Priest Lease on
October 1, 2000, and continued as operator until March 1, 2003. See Pretrial Order,
Stipulated Factual Contentions No. 17, Trial Transcript, Page 178, Lines 2-5, and Page
210, Lines 12-18.

36.     Blue Ridge became the operator of the Priest Lease in March 2003, and
continued as operator until some time in 2004. See Trial Transcript, Page 213, Lines 14-
20.

37.     Wildcat Energy became operator of the Priest lease after Blue Ridge leased
its operations. See Trial Transcript, Page 214, Lines 13-16.

38.     Topsoil in the area around the Priest Lease is less than 3 inches in thickness.
Tr. Volume 1, Page 234, Lines 1-3.

39.     In the earlier days of production in Lea County, producers and operators
commonly spread oil on the ground to combat dust. Tr. Volume 1, Page 234, Lines 6-16.

40.     Oil that arises on the surface in this area does not typically permeate the

vados zone down to the underground water. *Tr. Volume 1, Page 235, Lines 6-10.*

41.     Oil occurring at the surface of the area around the Priest Lease does not go below three feet beneath the surface. *Id.*

42.     In order for oil to migrate beneath the surface, there must exist a pressure differential to push the oil downward into the soil. *Tr. Volume 1, Page 245, Lines 18-20.*

43.     Any leaks or spills on or around the Priest Lease observed by OCD personnel, were isolated instances which were corrected and remediated. *Tr. Volume 2, Page 263, Lines 6-12.*

44.     Defendant Polaris appropriately filed all spill reports that were required by the OCD relating to the operating of the Priest Lease. *Id at lines 13 through 17.*

45.     Production equipment at the Priest Lease was checked on a daily basis a pumper under contract to Polaris. *Tr. Volume 2, Page 276, Lines 18-25.*

46.     The OCD Guidelines do not apply to spills of fewer than 5 barrels. *Tr. Volume 2, Page 458, Lines 10-18.*

47.     Under OCD regulations, codified at §19.15.3.116 of the New Mexico Administrative Code, a release of hydrocarbons greater than 5 barrels, but less than 25 barrels, is categorized as a "minor release." *Tr. Volume 2, Page 420 , Lines 2-6.*

48.     There is no reporting requirement for hydrocarbon spills and releases of less than 5 barrels. *Id.*

49.     During the operation of the Priest Lease by Defendant Polaris, only one spill occurred which required reporting, i.e., exceeded 5 barrels. *Tr. Volume 2, Page 281, Lines 5-10.*

50.     Defendant Polaris remediated this spill to the satisfaction of the OCD. *Tr.*

*Volume 2, Page 421, Lines 5-17.*

51.     The practices utilized by Defendant Polaris in remediation spills, including the placement of so-called "gin trash," specifically approved by Jerry Sexton, who was at all material times the district manager of the OCD. *Tr. Volume 2, Page 425, Line 18 through Page 426, Line 18.*

52.     Defendant Polaris never experienced any other spills or leaks that exceeded the minimum reporting requirement of 5 barrels on the Priest Lease. *Tr. Volume 2, Page 422, Lines 9-14.*

53.     All spills experienced by Defendant Polaris at the Priest Lease were confined within 18 inches of the surface. *Tr. Volume 2, Page 303, Lines 20-24.*

54.     In its operation of the Priest Lease, Defendant Polaris complied with the OCD Guidelines since their inception in 1993. *Tr. Volume 2, Page 304, Lines 21-23.*

55.     The establishment of a flow gradient for groundwater requires more than 2 monitor wells. *Tr. Volume 2, Page 318, Line 21 through Page 319, Line 2.*

56.     Plaintiff has not provided sufficient evidence to determine the age, volume, or source of any groundwater contamination that may have been discovered in the Monitor Wells drilled at the Priest Lease. *Tr. Volume 2, Page 331, Line 21 through Page 332, Line 2.*

57.     A lay person, without extensive experience and training in the assessment and remediation of oilfield contamination would not have specific expertise to determine the age, volume, or source of groundwater contamination that might be present in an underground monitor well. *Tr. Volume 2, Page 332, Lines 3-9.*

58.     In a letter dated December 11, 1997, Defendant Polaris reported to the New

Case 1:03-cv-00318-JCH-RLP Document 142 Filed 07/14/06 Page 8 of 13

Mexico OCD the progress that Polaris had made in carrying out the requirements imposed by the OCD as to the operation of the Priest Lease. *Tr. Volume 2, Page 342, Lines 17-23.*

59. The letter of December 11, 1997 from Defendant Polaris to the OCD invited the OCD to express any dissatisfaction it had with the progress being made by Polaris. *Tr. Volume 2, Page 343, Lines 3-7.*

60. The OCD never responded to the December 11, 1997 letter from Polaris, and expressed no dissatisfaction with the progress reported by Polaris. *Id at lines 8-12.*

61. At no time did an OCD field representative criticize or report Polaris to the OCD for any alleged failure by Polaris to report a hydrocarbon spill for which reporting was required. *Id at lines 13-21.*

62. On February 19, 1998, Polaris directed correspondence to the OCD, reporting continued progress being made by Polaris in response to instructions from the OCD on the Priest Lease. *Tr. Volume 2, Page 343, Line 22 through Page 344, Line 22.*

63. The February 19, 1998 letter invited the OCD to express to Polaris any concern or dissatisfaction the OCD had with progress being made by Polaris. *Tr. Volume 2, Page 344, Line 23 through Page 345, Line 2.*

64. Polaris received no response from the OCD to the aforesaid letter of February 19, 1998. *Tr. Volume 2, Page 345, Lines 3-6.*

65. On June 12, 1998, Polaris directed written correspondence to the OCD, again reporting progress made by Polaris in fulfilling the OCD requirements for the Priest Lease. *Tr. Volume 2, Page 345, Line 7 through Page 346, Line 7.*

66. Polaris never received any response from the OCD to the aforesaid June 12, 1998 letter, expressing any concern or dissatisfaction by the OCD with the progress being

made by Polaris at the Preist Lease. *Tr. Volume 2, Page 346, Lines 8-15.*

67.     In response to directives from the OCD, Defendant Polaris incurred
significant expenditures in performing multiple remediation procedures on and around the
Priest Lease facilities.  See generally, *Tr. Volume 2, Pages 341 through 353.*

68.     If the OCD discovers a spill or similar situation which the OCD believes
requires remediation, the OCD has the authority to cause such a remediation to be
commenced. *Tr. Volume 2, Page 392, Lines 1-10.*

69.     The OCD has the authority to request that an operator perform such a
remediation. *Id at Lines 11-15.*

70.     As of June, 1998, the Priest Lease tank battery was in acceptable condition,
and there were no active leaks or spills or any fresh oil on the ground at that time.  *Tr.
Volume 2, Page 432, Lines 18-24.*

71.     United experienced leaks during is operations of the Priest Lease. *See Trial
Transcript, Page 197, Lines 2-7, Page 205, Lines 7-17.*

72.     United's use of the surface of the Priest Property proximately caused surface
and subsurface damages to the Priest Property. *See Trial Transcript, Page 468, Lines 6-9.
see also Fed. R. Civ. P.36.*

73.     According to Plaintiff, United allowed hydrocarbons and produced water to
be released into the subsurface, where it eventually came into contact with the underlying
aquifer. *See Trial Transcript, Page 467, Lines 9-25.*

74.     Shell's use of the surface of the Priest property proximately caused surface
and subsurface damage to the Priest Property. *See Trial Transcript, Page 468, Lines 12-
16; see also Fed. R. Civ. P. 36.*

## Conclusions of Law

75.     This Court has jurisdiction of the parties and subject matter for the entry of an Order or Decree herein.

76.     The substantive law  governing this case is the law of the State of New Mexico.

77.     The decisions of this Court on all motions decided prior to trial by this Court are incorporated herein by reference, unless they are inconsistent with or otherwise countermanded by these Findings of Fact and Conclusions of Law, or any Judgment, Order or Decree subsequently entered pursuant hereto.

78.     In order for Plaintiff to maintain his claims for negligence and/or trespass, Plaintiff must have established by expert testimony that the alleged injuries to the Priest and Pacific properties were the result of excessive, unreasonable, or negligent use of the surface, in contravention of the usual, customary, and reasonable industry practices at the time and under like circumstances.

79.     Expert testimony is required when the alleged negligence of a Defendant is of such a nature as not to be within the common experience of a lay person.

80.     The owner/operator of the mineral estate has no duty under New Mexico law to restore the surface of property to its original condition, or to some other condition specified by the owner of the surface estate following the cessation of oil and gas production operations.

81.     The fact that the surface of property has been disturbed is not, in and of itself, evidence of unreasonable conduct.

82.     There is no implied duty requiring the owner of a mineral estate to repair or restore damage caused to land surface, by rightful and necessary use.

83.     The statute of limitations under New Mexico law for alleged injury to real property is four years.

84.     Expert testimony is required to prove that alleged surface and/or subsurface contamination has migrated, expanded, or otherwise changed.

85.     Plaintiff is not, and has not been, the owner of any water rights underlying the properties known as the Priest and Pacific Leases.

86.     Plaintiff presented no evidence in support of his claims for injury to the Pacific properties, and therefore all such claims relating to the Pacific properties should and have been dismissed.

87.     Plaintiff presented no evidence in support of his claim for damages, and those claims should be dismissed as a matter of law.

88.     Plaintiff's claims for negligence should be dismissed.

89.     Plaintiff presented no evidence in support of his claim for unjust enrichment, and that claim should be dismissed as a matter of law.

90.     A claim seeking restitution for unjust enrichment is equitable in nature.

91.     Plaintiff has the burden to show that any remedy he has at law is inadequate, before he may seek equitable relief.

92.     Defendant Polaris ceased all operations on the Priest Lease as of September 25, 2000.

93.     Because Plaintiff's only remaining claims at trial were equitable in nature, Plaintiff was not entitled to a jury trial.

94.     To establish a claim for public nuisance, a Plaintiff must prove that:

        a.      the nuisance is "public," i.e., the nuisance affects a large number of people;

        b.      the nuisance was knowingly created by the defendants;

        c.      the nuisance was without lawful authority; and

        d.      the defendant caused the nuisance.

95.     Plaintiff is not entitled to any remedy under §30-8-1, NMSA (1978), for alleged contamination of soils, because if such contamination occurred, it was limited to a small area of Plaintiff's private property, and does not affect the "public" generally.

96.     Conduct by a defendant does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons, thus, even if a stream is polluted, depriving 50 or 100 owners of the use of water connected with their land, does not for that reason alone become a public nuisance.

97.     The contamination alleged by Plaintiff herein is defined exclusively to Plaintiff's surface, and there is no evidence to suggest that the alleged contamination has migrated to the property of another person.

98.     There is no evidence to indicate that Defendant Polaris "knowingly" contaminated any groundwater.

99.     There is no evidence to indicate that Defendant Polaris contaminated any groundwater.

100.    Plaintiff must present expert testimony as to the cause of the alleged groundwater contamination.

101.    Plaintiff has introduced no expert testimony to establish the nature and

composition of the alleged contaminations, the duration of the alleged contamination, the source of the alleged contamination, or the date or dates on which the alleged contamination occurred.

Respectfully submitted,

**ATWOOD, MALONE, TURNER & SABIN, P.A.**

Rod M. Schumacher, Esq.
Carla A. Neusch Williams, Esq.
P.O. Drawer 700
Roswell, NM  88202-0700
505-622-6221
Attorneys for Defendant Polaris

I hereby certify that a true and correct copy of the foregoing was faxed and mailed to all parties of record this _14th_ day of __JULY____, 2006.

Rod M. Schumacher, Esq.