IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DARR ANGELL, Individually,
and STATE OF NEW MEXICO,
ex rel DARR ANGELL,

     Plaintiffs,

vs.                                                          No. CV 03-318 JCH/RLP

POLARIS PRODUCTION CORPORATION,

     Defendant.

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

THIS MATTER comes before the Court on a two-day bench trial commencing June 12,

2006.  At trial, Plaintiffs Darr Angell and the State of New Mexico ex rel. Darr Angell were

represented by Michael Newell, Esq. and Patrick McMahon, Esq., Defendant Polaris Production

Corporation ("Polaris") was represented by Rod Schumacher, Esq. and Carla Williams, Esq., and

Shell Oil Company ("Shell"), a former party to this case, was represented by Michael Mazzone,

Esq. and Marte Lightstone, Esq.  On the second day of trial, Plaintiffs and Shell informed the

Court that they had reached a settlement agreement, and Plaintiffs moved to dismiss their case

against Shell with prejudice.  The Court granted the motion.  After the close of trial, Plaintiffs

submitted their Proposed Findings of Fact and Conclusions of Law, filed July 14, 2006 [Doc. No.

140], and Defendant Polaris submitted its Requested Findings of Fact and Conclusions of Law,

filed July 14, 2006 [Doc. No. 142].  The Court having considered the parties' submissions, as well

as the evidence presented at trial and the relevant law, makes the following findings of fact and

conclusions of law.

**Findings of Fact**

1.      Plaintiff Darr Angell ("Angell") owns a ranch located approximately ten to twelve miles northeast of Lovington, New Mexico.  The property owned by Angell is formally known as Sections 1 and 10, Township 15 South, Range 37 East, Lea County, New Mexico.  Angell purchased Section 1 in 1992 and Section 10 in 1993.

2.      The Denton Oil Field is located approximately nine miles east of Lovington, New Mexico.  The Ogalalla Aquifer overlays the Permian Basin where the Denton Field is located. Part of the Denton Oil Field is located on Angell's property.

3.      The north half of Section 1 of Angell's property shall hereinafter be referred to as the Priest Lease.  The Priest Lease, as well as other leases, is located within the Denton Oil Field.

4.      Between 1947 and 1973 Shell had oil and gas leases and operations on the Priest Lease.  Shell was the original operator of the Priest Lease.  Shell also had oil and gas operations on the east half of Section 10.  The east half of Section 10 shall hereinafter be referred to as the Pacific Lease.  In 1973, Shell sold all of its interests in the Priest and Pacific Leases to Polaris and Centaur Petroleum Corporation.

5.      Polaris operated the Priest Lease for approximately 27 years, from 1973 to 2000.

6.      On September 25, 2000, Dynasty Oil and Gas, LLC acquired its interests in the Priest Lease from Polaris.

7.      United Operating, LLC ("United") became the operator of the Priest Lease on October 1, 2000, and continued as operator until March 1, 2003.

8.      Blue Ridge became the operator of the Priest Lease in March 2003, and continued as operator until some time in 2004.

2

9.      Wildcat Energy became operator of the Priest Lease after Blue Ridge leased its operations.

10.     Angell does not own any water rights underlying Sections 1 or 10.

11.     Of the 25 windmill wells on Angell's property, none reflects any impact by the oil and gas operations conducted on the Priest Lease.

12.     According to Angell, however, the producing property known as the Priest Lease was "in really bad shape" at the time Angell acquired his interest in the Lease.

13.     In approximately 2001, Angell caused to be drilled a test well, identified as Monitor Well Number 1, adjacent to and on the east side of the property occupied by the Priest Lease tank battery and/or pit.

14.     When Angell observed the drilling of Monitor Well Number 1, he observed contamination of five to seven feet and smelled hydrocarbons in the bore samples all the way down to the water table.

15.     Angell also observed hydrocarbons at the top of the water table.

16.     The liquid from the monitor well was brownish and smelled like crude oil.

17.     On June 8, 2006, a week prior to trial, Angell had another sample pulled from the monitor well and that liquid was consistent with the liquid obtained at the time of the original testing in 2001.

18.     Angell claims that as of June 8, 2006, there is a layer of oil measuring eight feet in thickness above the water table at the site of Monitor Well Number 1.

19.     Angell presented no evidence or testimony regarding the requisite volume of oil necessary to cause eight feet of oil to appear on top of the water table.

3

20.     The presence of contamination on the groundwater in 2006 was confirmed by Cliff Brunson ("Brunson"), Shell's environmental expert.

21.     Brunson confirmed the water was contaminated with benzene, trimethylbenzene, and xylene, which would be associated with groundwater contamination from oil field operations.

22.     Brunson acknowledged that the water samples collected had an odor of crude oil.

23.     The only well on Angell's property that reflects any ground water impact allegedly caused by oil and gas operations is Monitor Well Number 1.

24.     Angell does not use, nor has he ever used, Monitor Well Number 1 for his cattle.

25.     All groundwater testing that Angell caused to be performed was conducted after Polaris ceased its operations.

26.     There are multiple operations for the exploration and production of oil and gas in the area around the Priest Lease property.

27.     For example, a company known as EOTT experienced three separate spills near the location of the Priest Lease.

28.     There also is a pipeline previously operated by Amoco immediately east of the Priest Lease tank battery.

29.     Moreover, Angell indicated that he cannot be sure that the eight feet of oil alleged to be located on top of the water table at Monitor Well Number 1 did not come from Shell's oil and gas operations on the Priest Property.

30.     Also, in the earlier days of production in Lea County, producers and operators, including Polaris, commonly spread oil on the ground to combat dust.

31.     Leaks and spills of oil, gas, produced water, and other substances are common in

4

the oil and gas production industry.

32.    When Polaris took over operations from Shell, Polaris installed the Kobe triplex pump and its sump or pit on the east side of the Priest Lease battery.

33.    Kobe triplex pumps operate at high pressures.  Consequently, any type of leak will result in a "big mess."

34.    At times the sump in the Kobe triplex pump would overflow.

35.    New Mexico Oil Conservation Division ("OCD") field representatives occasionally complete documents entitled "Field Reports," the purpose of which are to note problem areas.  If an OCD field representative visits a location and does not complete a field report, the lack of such a report is an indication that the field representative did not detect any problem areas.

36.    The OCD  Priest Lease file contains numerous field reports documenting leaks on the Priest Lease property, particularly at the Kobe triplex pump and the sump, during the period when Polaris was the operator of the Priest Lease.

37.    These field reports include observations of the Kobe triplex pump leaking, the sump being full, and oil being released from the pump area inside and outside of the battery fence.

38.    At times, the area around the Kobe triplex pump at the Priest Lease battery was mucky with oil.

39.    On or about August 21, 1997, OCD field representative Gary Wink testified under oath during an OCD hearing that, with specific reference to the Priest Lease, there was no evidence of groundwater pollution.

40.    The OCD never imposed a fine against Polaris Production related to the Priest Lease.

41.     The OCD publishes a document entitled "Guidelines for Remediation of Leaks, Spills and Releases for the State of New Mexico" ("OCD Guidelines"), the publication of which began in 1993.

42.     The OCD Guidelines do not apply to spills of fewer than five barrels.

43.     Under OCD regulations, codified at Section 19.15.3.116 of the New Mexico Administrative Code, a release of hydrocarbons greater than five barrels, but less than 25 barrels, is categorized as a "minor release."

44.     There is no reporting requirement for hydrocarbon spills and releases of less than five barrels, so the OCD Guidelines do not apply to spills of fewer than five barrels.

45.     During the operation of the Priest Lease by Polaris, only one spill occurred that required reporting, *i.e.*, exceeded five barrels.

46.     Polaris remediated this spill to the satisfaction of the OCD.

47.     The practices utilized by Polaris in remediation of spills, including the placement of so-called "gin trash," were specifically approved by Jerry Sexton, who was at all material times the district manager of the OCD.

48.     Polaris never experienced any other spills or leaks that exceeded the minimum reporting requirement of five barrels on the Priest Lease.

49.     At no time did an OCD field representative criticize or report Polaris to the OCD for any alleged failure by Polaris to report a hydrocarbon spill for which reporting was required.

50.     If the OCD discovers a spill or similar situation that the OCD believes requires remediation, the OCD has the authority to request that an operator perform such remediation.

51.     In response to directives from the OCD, Polaris performed multiple remediation

procedures on and around the Priest Lease facilities and Polaris incurred expense in performing the remediations.

52.     By letters dated December 11, 1997, February 19, 1998, and June 12, 1998 Polaris reported to the OCD the progress that Polaris had made in carrying out the requirements imposed by the OCD as to the operation of the Priest Lease.

53.     Each of the letters from Polaris to the OCD invited the OCD to express any dissatisfaction it may have had with the progress being made by Polaris.

54.     The OCD never responded to Polaris or expressed dissatisfaction with the progress reported by Polaris.

55.     As indicated above, United succeeded Polaris as operator of the Priest Lease in October of 2000.

56.     When United took over operations of the Priest Lease, it observed old tanks, old equipment, and oil-saturated dirt that was very dark and appeared saturated with oil and some standing oil.

57.     United removed the Kobe triplex pump almost immediately after it assumed operations.  The removal eliminated the leaking from the Kobe triplex pump.

58.     When United took over operations it spent $100,000.00 repairing leaks on the Priest Lease.

59.     United experienced leaks during its operation of the Priest Lease.

60.     According to Angell, United allowed hydrocarbons and produced water to be released into the subsurface, where it eventually came into contact with the underlying aquifer.

61.     According to Angell, United's use of the surface of the Priest Property proximately

caused surface and subsurface damages to the Priest Property.

62.     According to Angell,  Shell's use of the surface of the Priest lease proximately caused surface and subsurface damage to the property on the Priest lease.

63.     Angell did not provide any expert testimony that established Polaris caused the contamination to the liquid that was pumped from any monitor well either in 2001 or 2006.

64.     Angell did not provide any expert testimony that established the effects of the substances found in the liquid that was pumped from any monitor well.

65.     Angell did not provide sufficient evidence to determine the age, volume, or source of any groundwater contamination that may have been discovered in any monitor wells drilled at the Priest Lease.

## Conclusions of Law

1.     This Court has jurisdiction over the parties hereto and subject matter herein.

2.     Angell did not meet his burden of proof that Polaris created a public nuisance.

3.     Angell did not meet his burden of proof that Polaris caused the contamination in the Ogallala Aquifer.

4.     Angell's claims should be dismissed with judgment entered in favor of Polaris.


Dated this 19th day of January 2007.


JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE